# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ROBERT SIKON,                                    )     CASE NO. 5:20-cv-674
*Co-Administrator of the Estate of Deceased*     )
*Robert Stanley Sikon, III*, et al.,             )
                                                 )
                                                 )
            PLAINTIFFS,                          )     JUDGE SARA LIOI
                                                 )
vs.                                              )     **MEMORANDUM OPINION**
                                                 )     **AND ORDER**
                                                 )
CARROLL COUNTY, et al.,                          )
                                                 )
                                                 )
            DEFENDANTS.                          )


Pending before this Court is the motion for summary judgment filed by defendant Jacob Baker ("Deputy Baker"). (Doc. No. 67 (Motion).) Plaintiffs Robert Sikon and Melissa Ford, co-administrators of the Estate of Robert Stanley Sikon, III ("Sikon"), (collectively, "plaintiffs") filed an opposition (Doc. No. 75 (Opposition)), and Deputy Baker filed a reply (Doc. No. 81 (Reply)). For the reasons discussed herein, Deputy Baker's motion for summary judgment is granted in part and denied in part.

## I.    BACKGROUND

On November 16, 2019, Deputy Baker was assisting at a traffic accident in Carroll County, Ohio, when he saw a pickup truck drive by with Sikon riding in the passenger seat. (Doc. No. 62 (Deposition of Jacob Baker), at 36:8–14.[1]) Deputy Baker testified that he knew Sikon had active

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the

warrants for his arrest and advised Carrollton police that he had spotted Sikon. (*Id.* at 36:15–37:13; 37:19–25.) After Deputy Baker finished his duties at the traffic accident, he left the scene and (whether by chance or with purpose) happened upon the pickup truck. (*Id.* at 49:9–50:1.) Deputy Baker activated his lights and pulled over the pickup truck. (*Id.* at 50:17–51:3.)

Exactly what happened next is largely disputed by the parties. (*See, e.g.*, *id.* 130:16–136:14) (disagreeing with eyewitness testimony).) It is, however, undisputed that Deputy Baker attempted to arrest Sikon, a struggle ensued outside of the pickup truck, the two men separated and Sikon took at least a few steps away from Deputy Baker, after which Deputy Baker shot Sikon, claiming he thought Sikon was pulling a gun in Deputy Baker's direction. Sikon was, in fact, unarmed. Tragically, Sikon succumbed to the injuries that he sustained in the shooting.

On March 30, 2020, Sikon's father and oldest daughter brought this suit on behalf of Sikon's estate.[2] They allege four claims against Deputy Baker: (1) 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment,[3] (2) assault and battery, (3) wrongful death, and (4) intentional infliction of emotional distress.[4] (*See generally* Doc. No. 1.) On February 28, 2023,

---

electronic filing system.

[2] This action was stayed for a period of time while the state investigated and prosecuted Deputy Baker's use of deadly force against Sikon. (Doc. Nos. 16, 18.) Deputy Baker was indicted for voluntary manslaughter (Doc. No. 17-1), but ultimately the jury found him not guilty. (*See* Doc. No. 19.)

[3] Although plaintiffs allege in their complaint that Deputy Baker violated Sikon's Fourth and Fourteenth Amendment rights (Doc. No. 1 ¶ 34), "claims for excessive force during an arrest are analyzed under the Fourth Amendment's unreasonable seizure jurisprudence." *Ellis v. Timm*, 504 F. Supp. 3d 726, 734 (N.D. Ohio 2020) (citing *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400–01 (6th Cir. 2009) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001))). Plaintiffs seem to concede this point in their opposition. (Doc. No. 75, at 19 ("Plaintiffs . . . assert federal and state claims against [Deputy Baker] arising out of the shooting: [a]n excessive force claim under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 . . . .").)

[4] The complaint originally included two additional 42 U.S.C. § 1983 claims: (1) against Deputy Baker for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment; and (2) against defendants Carroll County and Sheriff Dale Williams, in his official capacity, for failure to train and supervise and for unconstitutional customs, policies, and practices causing constitutional violations. The parties stipulated to the dismissal of these claims (Doc. No. 53.) The remaining claims are against Deputy Baker only. Because the parties stipulated to the dismissal of

Deputy Baker moved for summary judgment in his favor as to all claims against him. (Doc. No. 67.) On March 28, 2023, plaintiffs filed an opposition (Doc. No. 75), and on April 11, 2023, Deputy Baker filed a reply (Doc. No. 81). This matter is now ripe for this Court's review.

## II.     Legal Standard – Motion for Summary Judgment

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a). In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is material if its resolution affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The district court's review on summary judgment is a threshold inquiry to determine whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Id.* at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir.

---

the only claim against defendants Carroll County and Sheriff Dale Williams, both defendants are hereby dismissed from this case. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").

2003). Where the evidence presents a sufficient disagreement, summary judgment is not appropriate, and the dispute should be submitted to the jury for resolution.

## III.    DISCUSSION

In his motion, Deputy Baker contends that he is entitled to judgment on all plaintiffs' claims against him either because there is insufficient evidence to establish the claims or, alternatively, because he is entitled to qualified immunity under both federal and state law. (*See* Doc. No. 67, at 5.)

### A.  Excessive Force

Deputy Baker contends that his use of deadly force against Sikon was objectively reasonable because he "believed Sikon was reaching to draw a weapon and shoot him." (*See* Doc. No. 67, at 9.) Alternatively, Deputy Baker contends that he is entitled to qualified immunity because Deputy Baker "reasonably believed, although mistakenly, that [ ] Sikon was armed and his behavior manifested an intention to kill [Deputy Baker]." (*Id.* at 12.) Plaintiffs contend that Deputy Baker violated Sikon's Fourth Amendment rights to be free from excessive force when he shot Sikon in the back while Sikon was fleeing, unarmed. (*See* Doc. No. 75, at 7.) Plaintiffs further contend that case law is sufficiently clear that shooting an unarmed, non-violent suspect in the back while they flee would violate their rights. (*Id.*)

Individual officers are entitled to qualified immunity from liability for civil damages in Section 1983 cases, "insofar as their conduct does not violate clearly established statutory or constitutional rights." *Bouggess v. Mattingly*, 482 F.3d 886, 887 (6th Cir. 2007). "A plaintiff can overcome that immunity only by showing that (1) the defendant violated his constitutional or

4

statutory rights and (2) the right at issue was sufficiently clear that a reasonable official would have understood that what he was doing violated that right." *Id.*

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). The Sixth Circuit has instructed that district courts must "assess[] the reasonableness of a seizure in distinct stages." *Bouggess*, 482 F.3d at 889. "An officer's prior errors in judgment do not make a shooting unreasonable as long as the officer acted reasonably during the shooting itself and the few moments directly preceding it." *Id.* (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)). "In other words, whether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at that moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 197, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)). That objective assessment requires asking whether "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" *Garner*, 471 U.S. at 11. Under that standard, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.*; *see also Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.") (citations omitted). "Absent such probable cause, however, a police officer may not seize

5

a fleeing felon by employing deadly force." *Bouggess*, 482 F.3d at 889 (citing *Garner*, 471 U.S. at 11–12).

This case then turns on whether Deputy Baker had probable cause to believe that Sikon posed a threat of serious physical harm to Deputy Baker or others in the moments immediately preceding the shooting.[5]

Deputy Baker contends that he did because he saw Sikon start to turn around while he was moving away from Deputy Baker, reach into his waistband, and draw his arm. (Doc. No. 62, at 156:23–157:2.) Deputy Baker testified that, from these actions, he believed Sikon was pulling a gun to shoot him. (*See, e.g.*, *id.* at 104:7–17.) While Sikon was in fact unarmed, the Court acknowledges that Deputy Baker would have had only a split second to make that determination. In justifying his belief and reaction, Deputy Baker cites his prior knowledge that Sikon was known to possess and maybe carry a gun, Sikon's violent threats to others, and Sikon's association with illegal activity. (*See, e.g.*, Doc. No. 67, at 6.) Deputy Baker also contends that he "had a heightened threat assessment" given Sikon's "movements in the vehicle and his exiting the vehicle without any commands," "ready to fight," and because "Sikon had already assaulted him and Deputy Baker believed he tried to take his duty weapon." (*Id.* at 6, 11; *see also* Doc. No. 62, at 43:1–44:8; 45:1–6; 68:17–69:14.)

---

[5] The Sixth Circuit has pointed to a non-exhaustive list of factors for courts to consider when applying *Garner*'s "probable cause standard" in excessive force cases: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989))). But in deadly force cases, such as this, the first and third factors seem to give way to the second factor: whether the officer had probable cause to believe the suspect posed an immediate threat to the officer or others. *See, e.g.*, *Bouggess*, 482 F.3d at 889–892 (acknowledging and discussing the first and third factors but "focus[ing on] whether [the officer] had probable cause to believe that [the plaintiff] posed a serious danger to him or to others[.]").

But there is evidence in the record from which a jury could find that events transpired differently than as described by Deputy Baker. And on his motion for summary judgment, this Court must view that evidence in the light most favorable to plaintiffs. *Adickes*, 398 U.S. at 157; *White*, 909 F.2d at 943–44. If plaintiffs can prevail under that evidence, then summary judgment is inappropriate.

Because Sikon died as a result of the events giving rise to this suit, plaintiffs rely on eyewitness testimony and forensic evidence to support their claims. The driver of the pickup truck testified that, after she pulled over, Deputy Baker "jump[ed] out of his car, pull[ed] his gun and sa[id], 'Let me see your hands, let me see your fucking hands!'" (Doc. No. 69-1 (Deposition of Jami Vinka Marcus), at 29:2–4.) She further testified that while Sikon was "fidgeting" immediately after Deputy Baker pulled them over, Sikon obeyed Deputy Baker's commands and "put his [hands] out the window [but] then dropped his [cigarette] lighter down inside the truck and put his hands all the way out" again. (*Id.* at 28:19–21, 29:7–9.) According to the driver, Deputy Baker then approached the passenger side of the truck, "ripped the door open" "yanked [Sikon] out and slammed him up against the side of [the] truck[.]" (*Id.* at 29:9–11.) She testified that Deputy Baker was "being rough with" Sikon as he was "patting [him] down[.]" (Doc. No. 75-2 (Jami Vinka Marcus' Trial Testimony, *Ohio v. Baker*, No. 2020-cr-6493 (Ohio Ct. Com. Pl. July 20, 2021)), at 16–17.) She said that she heard Sikon ask Deputy Baker what was going on multiple times, but Deputy Baker would not tell him. (*See* Doc. No. 69-1, at 29:13–24.)

If believed by a factfinder, this evidence directly refutes Deputy Baker's testimony that Sikon disobeyed his commands to stay in the truck and instead exited the truck "ready to fight,"

and it would be relevant to the extent Deputy Baker relies on Sikon's prior acts of aggression to justify perceiving Sikon as a threat moments later.

Next, the driver of the vehicle testified that she saw Deputy Baker and Sikon engaged in a "tussle" in the yard next to the truck. (Doc. No. 69-1, at 34:5–18.) She testified that she described the interaction as a "tussle" because, while Sikon was trying to free his arm from Deputy Baker's grip, neither person was hitting or injuring the other the way Deputy Baker described.[6] (*Id.*) If believed by the fact finder, this evidence refutes Deputy Baker's testimony that he and Sikon engaged in an aggressive struggle whereby Sikon assaulted Deputy Baker and attempted to obtain Deputy Baker's gun, which would be relevant to the extent Deputy Baker relies on this struggle to explain why he thought Sikon posed an imminent, violent threat seconds later.

The driver of the pickup truck testified that she witnessed Sikon break free of Deputy Baker's grip and take off running. (Doc. No. 69-1, at 36:14–15.) She testified that Deputy Baker started after Sikon but then pulled his gun, held it up and shouted, "Stop or I'll fucking kill you[.]" (*Id.* at 36:15–18, 48:2–5.[7]) Deputy Baker then fired his gun nine times. (*Id.* at 36:18; Doc. No. 62, at 109:2–7.) Four bullets struck Sikon in the back: one to his left shoulder, two to his left upper back, and one to the left mid-back. (Doc. No. 75-3 (Autopsy Report), at 5–7.) There was also a

---

[6] Plaintiffs further question Deputy Baker's version of the struggle by citing Deputy Baker's medical records from the day of the incident. While Deputy Baker testified that Sikon caused him "significant pain" by hitting him in the ribs (Doc. No. 62, at 80:11–13), his medical records from the day of the shooting do not mention any reported injury to his ribs, only an abrasion to his knee and lower back pain. (*See* Doc. No. 79-1 (Sealed Medical Records).) But Deputy Baker testified that he did not report any rib pain until "a few days" after the shooting (Doc. No. 62, at 80:14–20), thus, any complaint of rib pain would not appear in the cited medical records from the day of the shooting.

[7] Deputy Baker does not dispute saying "I will fucking kill you," immediately before firing his weapon. (Doc. No. 62, at 100:18–22.)

"probable graze gunshot wound" to Sikon's right hip. (*Id.* at 8.) The medical examiner determined that the bullets causing the wounds in Sikon's back traveled back to front. (*Id.* at 5–7.)

Relying on the autopsy report and other analysis, plaintiffs' expert (Christopher Fries ("Fries")) opined that Sikon "had his back to [Deputy] Baker at the time he was shot four times." (Doc. No. 66, at 236.) Fries opined that Sikon had "a rotation of 0 degrees for at least one shot and a maximum of 35 degrees (plus or minus 3 degrees)" for the other shots. (*Id.* at 234.) If believed, a fact finder could find that this contradicts Deputy Baker's contention (as demonstrated in his interview with the Ohio Attorney General's Bureau of Criminal Investigations) that Sikon was turning around and almost completely sideways (a 70- to 90-degree turn) when Deputy Baker began to shoot. (*See* Doc. No. 76, Exhibit 3 (Deputy Baker BCI Interview Video 2), at 31:45–32:05.) Further, one of Deputy Baker's own experts (Judy Melinek ("Melinek")) opined that the possible graze wound on Sikon's hip (if in fact a graze wound) would suggest that, at most, Sikon was "a little bit bladed to the right" but not close to a full turn as Deputy Baker demonstrated during his deposition video. (Doc. No. 71-1 (Deposition of Judy Melinek), at 38:19–39:2, 40:16–25.)

While Deputy Baker's experts (Alexander Jason ("Jason") and Melinek) do not seem to dispute that Sikon had his back to Deputy Baker when the four bullets entered his body, Jason opines that one piece of forensic evidence is still compatible with Deputy Baker's version of events: a defect in Sikon's sweatpants. Jason opines that the defect suggests that Sikon was "facing sideways towards Deputy Baker" when Deputy Baker first fired his weapon. (Doc. No. 72-1, Exhibit 1 (Jason Report), at 109; Doc. No. 72-1 (Deposition of Alexander Jason), at 20:25–21:6.) But Jason seemed to concede that this defect in Sikon's sweatpants only supports Deputy Baker's

testimony if the defect was caused by a bullet and he was at best "uncertain" as to whether that is the case because he did not observe any exit hole, which he would expect to see if the defect was caused by a bullet. (*See id.* at 14:7–13; 32:25–33:20; 79:19–80:8.) And while Melinek opined that the defect in the sweatpants could correspond with the probable graze wound on Sikon's hip, which would explain why there was no exit hole (because the bullet grazed over Sikon's hip and sweatpants rather than through either), she seemed unable to reconcile her explanation with Jason's opinion that the defect was caused by a bullet that went through Sikon's sweatpants and into the ground. (*See* Doc. No. 71-1, at 62:13–63:13.)

In any event, Deputy Baker's experts' opinions are at odds with Fries, who ultimately opined that "[t]here is no forensic evidence" that Sikon "made any turning motion before he was shot." (Doc. No. 66, at 236.) And, at this stage of the proceedings, the Court must view the evidence in the light most favorable to plaintiffs.

Fries also opined that forensic evidence suggests that Sikon was 24 to 36 feet away from Deputy Baker when he was shot. (*Id.*.) Even Jason acknowledged that Sikon could have been 26 feet away from Deputy Baker when he was shot. (*See* Doc. No. 72-1, at 63:4–5.) If believed, this would contradict Deputy Baker's testimony that Sikon was only a few steps (three to five feet) away when Sikon turned towards Deputy Baker and Deputy Baker started to shoot. (*See* Doc. No. 62, at 97:6–19.) While a difference of twenty or thirty feet might not be relevant to Deputy Baker's risk analysis, if Sikon really did turn toward him while drawing his elbow from his waistband, the distance differential is relevant to the extent that such a considerable distance might permit a jury to find that Sikon had started running to flee before the shots were fired.[8]

---

[8] Photographs from the scene of the shooting also suggest that the distance between Deputy Baker and Sikon may

Plaintiffs also believe that it is noteworthy that Deputy Baker testified that he still believed Sikon was a risk immediately after he was shot and moving around on the ground (Doc. No. 62, at 140:8–11), but Deputy Baker did not warn Deputy Hale that Sikon might have a weapon (Doc. No. 70-1 (Deposition of Deputy Edward L. Hale), at 24:23–25), even though Deputy Baker left Deputy Hale to "watch" Sikon while Deputy Baker retrieved his first aid kit (*id.* at 24:2–4) and Deputy Hale helped handcuff Sikon (*id.* at 24:12–18).[9] Plaintiffs contend that this suggests Deputy Baker did not actually believe Sikon possessed a gun or posed any objective threat to him or other officers. *See Bouggess*, 482 F.3d at 888 & n.1 (highlighting, as evidence that the defendant-officer did not think the plaintiff-suspect was armed, that fact that immediately after the shooting the defendant-officer did not warn fellow officers on the scene that the suspect might have a weapon).

As stated above, this case turns on whether Deputy Baker had probable cause to believe that Sikon posed a threat of serious physical harm to Deputy Baker immediately preceding the shooting.[10] Specifically then, this case turns on whether Sikon did in fact turn towards Deputy Baker, reach into his waistband, and draw his arm in Deputy Baker's direction. (*See* Doc. No. 62, at 156:23–157:10.) *Compare Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (denying summary judgment because it was disputed whether the plaintiff-suspect was pointing his rifle at

---

have been closer to twenty-six feet than three feet. A group of shell casings depict Deputy Baker's general location (*see* Doc. No. 64 (Deposition of Brian Landers), at 56:12–14, 56:23–57:5) and a pool of blood approximately 36 feet away from the shell casings depicts the general location where Sikon would have collapsed and started bleeding out, after taking "[a] couple more steps" from where he was first shot. (Doc. No. 62, at 118:20–24; *see also* Doc. No. 64, at 57:6–22; Doc. No. 66, at 226.)

[9] Deputy Baker testified that he did convey to Deputy Hale that Sikon was armed when he told Deputy Hale to "[w]atch his hands" and "[c]over him." (Doc. No. 62, at 144:20–25.) Whether Deputy Baker thought this conveyed that Sikon was armed, it is undisputed that Deputy Baker never explicitly told Deputy Hale that he thought Sikon was armed. (*See* Doc. No. 24:23–25.)

[10] Deputy Baker conceded that he had no reason to believe that Sikon posed an imminent threat to others in the moments immediately preceding the shooting. (Doc. No. 62, at 121:8–10.)

officers just before the defendant-officer shot and killed him), *and Redrick v. City of Akron*, No. 21-3027, 2021 WL 5298538, at *4–5 (6th Cir. Nov. 15, 2021) (affirming denial of summary judgment where disputed issue of "immediate threat" turned on whether plaintiff-suspect was raising gun from his hip immediately before defendant-officer shot him in the back), *with Pollard v. City of Columbus*, 780 F.3d 395, 403–04 (6th Cir. 2015) (finding use of deadly force constitutionally permissible where evidence showed that plaintiff-suspect "made gestures suggesting he had a weapon, gestures he continued to make even after officers told him to 'Drop it' and 'Don't do it.'"). If believed, Deputy Baker's testimony suggests that he did. But forensic and circumstantial evidence, if believed, suggests that he did not.

Viewing the evidence in the light most favorable to plaintiffs, as the Court must at this stage of the proceedings, a jury could find that Deputy Baker shot Sikon four times in the back, while Sikon was unarmed and attempting to evade arrest for non-violent crimes and without posing any objective risk of immediate harm to Deputy Baker. While Deputy Baker's testimony and alternative theories may be true, that is for the jury to decide.[11] *Brandenburg*, 882 F.2d at 215–16 ("[When] the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury[,]" the "jury becomes the final arbiter of [a] claim of immunity[.]") A genuine issue of material fact remains as to whether Sikon turned around while moving away from Deputy Baker and pulled his arm from his waistband. And, thus, a genuine issue of material fact remains

---

[11] For example, to explain the forensic evidence that Sikon had his back to Deputy Baker when the bullets entered his body, Deputy Baker contends that plaintiffs' expert acknowledged the hypothetical possibility that Sikon turned around with his arm pulled and then, in the split second between Deputy Baker assessing the risk and firing his weapon, turned back around so his back was facing Deputy Baker as he was shot. (Doc. No. 67, at 15.) While this may be possible, at this stage the Court must read the facts in the light most favorable to plaintiffs—not resolve possible factual inferences in Deputy Baker's favor.

as to whether Deputy Baker violated Sikon's Fourth Amendment rights to be free from excessive force.

Still, Deputy Baker is immune from suit unless the law "so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from [this] conduct." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987).

As stated above, viewing the evidence in the light most favorable to plaintiffs, a jury could find that Deputy Baker shot Sikon four times in the back, while Sikon was unarmed and attempting to evade arrest for non-violent crimes and without posing any objective risk of immediate harm to Deputy Baker. Several Sixth Circuit cases have denied qualified immunity when an officer shot a fleeing suspect who did not pose an objective risk of immediate harm to the officer or others in the moments immediately preceding the use of deadly force.

For example, in *Bouggess v. Mattingly*, the defendant-officer encountered several individuals, including the plaintiff-suspect, during a drug-sting operation. The other suspects on the scene reached into the defendant-officer's car and took some of his money before running away. 482 F.3d at 888. The defendant-officer "got out of the car to see which way the suspects ran so that he could radio that information to his fellow officers." *Id.* At no point, however, did the defendant-officer "radio for help or in any way indicate to other officers that they should be concerned that any of the suspects (including [the plaintiff-suspect]) might be armed." *Id.*

The defendant-officer saw the plaintiff-suspect nearby, bending down to pick up a twenty-dollar bill. *Id.* He sought to arrest the plaintiff-suspect, but a struggle ensued. *Id.* "No guns were drawn and no shots were fired during the struggle." *Id.* At some point, the plaintiff-suspect broke

13

free and ran directly away from the defendant-officer. *Id.* at 889. The defendant-officer then "drew his gun and fired at least three shots at [the plaintiff-suspect]." *Id.* "According to the medical examiner's report, three shots struck [the plaintiff-suspect] in the back." *Id.*

The plaintiff-suspect managed to flee, injured, around a corner and sit down. *Id.* Defendant-officer and another officer approached him. Defendant-officer did not warn his fellow officer that the plaintiff-suspect might have a weapon. *Id.* Another officer on the scene, with his gun holstered, then approached the plaintiff-suspect to handcuff him, during which time the plaintiff-suspect struggled with officers to resist being handcuffed. The defendant-officer "did not warn that officer that [the plaintiff-suspect] might be armed." *Id.* The plaintiff-suspect died from his injuries soon after the shooting and was, in fact, carrying a firearm in his waistband. *Id.*

Viewing the facts in the light most favorable to the plaintiff-suspect, the Sixth Circuit held that the defendant-officer violated the plaintiff-suspect's clearly establish constitutional rights when he used deadly force to shoot the plaintiff-suspect in the back while the plaintiff-suspect fled with his back turned because the defendant-officer "did not know or suspect that [the plaintiff-suspect] had a firearm." *Id.* at 890. The Sixth Circuit held that "[i]t cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of *serious* physical harm to the officer or to others." *Id.* (emphasis in original). The court noted that, while resisting arrest may justify some force, "it does not justify *deadly* force, especially when the struggle has concluded and the suspect is in flight." *Id.* (emphasis in original) (citing cases). The Court then held that the defendant-officer was not entitled to qualified immunity because shooting a suspect

14

dead "without 'probable cause to believe' that he posed 'a threat of serious physical harm, either to the officer or to others' . . . was [a] clearly established [right] at the time the shooting took place." *Id.* at 896 (citation omitted).

In *Bouggess*, the defendant-officer did not know the plaintiff-suspect was armed and had only a "hunch" that he was. *See id.* at 892. But even when a defendant-officer knows without a doubt that a suspect possesses a gun, courts have denied qualified immunity when a defendant-officer used deadly force but there was a question as to whether the suspect posed an imminent threat to the officer or others in the moments immediately preceding the shooting. For example, in *Brandenburg v. Cureton*, a suspect had fired six shots, at least two of which were into the air when officers arrived at his house to serve a warrant. 882 F.2d at 213. He also told officers to leave his property, or they would be killed. *Id.* The suspect put down his rifle, but one officer opened fire on the suspect when the suspect moved to pick up the rifle again. *Id.* In that case, the Sixth Circuit denied qualified immunity to the officer who fired the fatal shots because there was an issue of fact as to whether the suspect had pointed his gun at the other two officers just before the shooting. *Id.* at 215.

Here, Sikon was in fact unarmed when Deputy Baker shot him. In contending that he is nevertheless entitled to qualified immunity, Deputy Baker relies on his belief that Sikon turned toward Deputy Baker and started drawing his arm from his waistband. But, as discussed above, there is a factual dispute as to whether that happened, and, for purposes of deciding this motion, the Court must accept the evidence that suggests that Sikon may have been fleeing and had his back to Deputy Baker when he was shot. The Court "cannot immunize [Deputy Baker] from suit by resolving disputes of material fact in his favor." *Bouggess*, 482 F.3d at 896 (citing *Johnson v.*

15

*Jones*, 515 U.S. 304, 319–20, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995)). As such, Deputy Baker is not entitled to qualified immunity on plaintiffs' excessive force claim. *See Sigley v. Kuhn*, 205 F.3d 1341 (Table), 2000 WL 145187, at *5 (6th Cir. Jan. 31, 2000) ("[S]ummary judgment on the issue of qualified immunity is not appropriate [because] there is a factual dispute on which the question of immunity turns, 'such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" (quoting *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)).

For all the aforementioned reasons, Deputy Baker's motion for summary judgment is denied as to plaintiffs' claim of excessive force in violation of the Fourth Amendment.

### B. Plaintiffs' State-Law Claims

Plaintiffs also brought claims against Deputy Baker for (1) assault and battery, (2) wrongful death, and (3) intentional infliction of emotional distress. Deputy Baker contends that he is entitled to summary judgment on all three claims because plaintiffs cannot establish the merits of each claim or, alternatively, because he is entitled to statutory immunity under Ohio law. (Doc. No. 67, at 18–24.)

#### 1. Ohio's Statutory Immunity

As an initial matter, the Court finds that Deputy Baker is not entitled to statutory immunity under Ohio law. Ohio Rev. Code § 2744.03(A)(6)(a)–(b) (providing a form of statutory immunity to state employees, unless they acted "outside the scope of the employee's employment" or "with malicious purpose, in bad faith, or in a wanton or reckless manner"). Plaintiffs' claims of assault and battery, wrongful death, and intentional infliction of emotional distress all rest on the same issues of material fact as plaintiffs' excessive force claim: whether Deputy Baker violated Sikon's

16

Fourth Amendment rights to be free from excessive force. The Sixth Circuit has held that "[w]hen federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, [the court] may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'" *Redrick*, 2021 WL 5298538, at \*5 (quoting *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) (quoting *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018))).

Just as a jury could find that Deputy Baker violated Sikon's Fourth Amendment rights when he shot Sikon in the back while he fled, a jury could also find that Deputy Baker acted in a wanton or reckless manner or with malicious purpose. *Stewart v. City of Euclid*, 970 F.3d 667, 677 (6th Cir. 2020) ("'[I]f the trier of fact were to find that [the decedent] posed no immediate threat of harm to anyone else . . . then the officer's actions in shooting the decedent were reckless at best.'" (quoting *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011) (further citation omitted))). For these reasons, Ohio's statutory immunity is unavailable to Deputy Baker on summary judgment for plaintiffs' state-law claims.

### 2.  Plaintiffs' Assault and Battery Claim

Even without immunity, Deputy Baker contends that he is entitled to summary judgment on plaintiffs' claim of assault and battery because he was privileged to commit any said assault and battery against Sikon during an arrest. (Doc. No. 67, at 18.) While officers are privileged to commit battery when making a lawful seizure, *Alley v. Bettencourt*, 730 N.E.2d 1067, 1073 (Ohio Ct. App. 1999), Deputy Baker concedes that any such privilege is negated by excessive force. (Doc. No. 81-1, at 20 (citing *Alley*, 730 N.E.2d at 1073).) Deputy Baker contends that his use of deadly force was justified but, for the reasons discussed throughout this memorandum opinion,

17

and viewing the evidence in a light most favorable to plaintiffs, a factfinder could determine otherwise, negating any privilege to commit battery when shooting Sikon.[12] *See Martin v. City of Broadview Heights*, No. 1:08-cv-2165, 2011 WL 3648103, at *14 (N.D. Ohio Aug. 18, 2011) (denying defendants' motion for summary judgment on plaintiff's assault and battery claim on the basis of privilege because plaintiff presented evidence of excessive force (citing *Alley*, 730 N.E.2d at 1073)). For these reasons, Deputy Baker's motion for summary judgment as to plaintiffs' claim of assault and battery is denied.

### 3.  Plaintiffs' Wrongful Death Claim

Deputy Baker also contends that he is entitled to summary judgment entered in his favor as to plaintiffs' wrongful death claim because his use of deadly force against Sikon was reasonable and, under Ohio law, officers are relieved of liability for wrongful death claims when their use of deadly force was reasonable. (Doc. No. 67, at 21 (citing *Ashford v. Betleyoun*, No. 22930, 2006 WL 1409793, at *5 (Ohio Ct. App. May 24, 2006)).)

To prevail on their claim of wrongful death, plaintiffs must prove: "(1) a wrongful act, neglect, or default of the defendant that proximately caused the death and that would have entitled the decedent to maintain an action and recover damages if death had not ensued; (2) the decedent was survived by a spouse, children, parents, or other next of kin; and (3) the survivors suffered damages by reasons of the wrongful death." *Wade v. Mancuso*, 111 N.E.3d 575, 579 (Ohio Ct. App. 2018) (internal quotation marks and citations omitted). Again, for all the reasons discussed

---

[12] Plaintiffs' complaint is not clear whether their claim for assault and battery concerns some conduct during the "tussle" and/or the shooting. (*See* Doc. No. 1 ¶¶ 52–57.) But it appears from plaintiffs' opposition brief that their claim relates to the shooting only (Doc. No. 75, at 25–26), and at no point have plaintiffs pointed to any evidence in the record that would establish that Deputy Baker used excessive force during the "tussle" with a resisting/fleeing suspect.

throughout this memorandum opinion, and considering the evidence viewed in a light most favorable to plaintiffs, a reasonable jury could find that Deputy Baker's use of deadly force against Sikon was a "wrongful act" that would establish plaintiffs' wrongful death claim. *See Martin*, 2011 WL 3648103, at *15 (denying defendant-officers' motion for summary judgment as to plaintiffs' wrongful death claim because there was a genuine issue of material fact regarding whether defendant-officers violated the decedent's Fourth Amendment rights); *see also Sabor v. City of Mentor*, 1:10–cv–345, 2010 WL 4008823, at *9 (N.D. Ohio Oct. 12, 2010) (denying summary judgment on the plaintiff's wrongful death claim and Fourth Amendment excessive force claim based on the same triable fact—whether the officer acted unlawfully when he shoot the plaintiff); *Stephens v. City of Akron*, 729 F. Supp. 2d 945, 965 (N.D. Ohio 2010) ("The factual disputes that preclude summary judgment on [p]laintiff's § 1983 claims against the officers likewise prevent summary judgment on the state law claims.").

For these reasons, Deputy Baker's motion for summary judgment as to plaintiffs' claim of wrongful death is denied.

### C.  Intentional Infliction of Emotional Distress

As to plaintiffs' claim of intentional infliction of emotional distress, Deputy Baker contends that "[c]laims of intentional infliction of emotional distress based upon lawful actions taken by police officers have consistently failed in the State of Ohio." (Doc. No. 67, at 20.) While there is genuine dispute as to whether Deputy Baker's actions were lawful, plaintiffs' claim of intentional infliction of emotional distress fails as a matter of law in any event.

To establish *a prima* facie claim for intentional infliction of emotional distress, "a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that

the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994). Here, while a jury could find that Deputy Baker may have intended to cause Sikon *physical* injury to prevent him from evading arrest, and that Sikon likely did endure physical pain and anguish, there is no evidence from which a jury could find that Deputy Baker *intended* to cause Sikon any *emotional* distress. Without any such evidence, plaintiffs' claim fails as a matter of law. *See Henderson v. Jackson*, No. 15-cv-10807, 2016 WL 3125214, at *12 (E.D. Mich. June 3, 2016) (dismissing claim for intentional infliction of emotional distress where defendant-officer shot plaintiff-suspect to prevent from him evading arrest because "plaintiff . . . presented ample evidence that [defendant-officer] intended to cause *physical* injury upon [decedent], but there is no evidence that the defendant intended to inflict emotional trauma." (emphasis in original)); *see also Davis v. City of Detroit*, No. 05-cv-72669, 2006 WL 2990511, at *8–9 (E.D. Mich. Oct. 19, 2006) (finding that defendant-officer's act of shooting what appeared to be a fleeing felon at night is not outrageous). *Cf. Burgess v. Fischer*, 735 F.3d 462, 480–81 (6th Cir. 2013) (allowing claim for intentional infliction of emotional distress to proceed where evidence suggested defendant-officer beat plaintiff to humiliate and punish him for a seemingly offensive remark). For these reasons, Deputy Baker's motion for summary judgment as to plaintiffs' claim of intentional infliction of emotional distress is granted and this claim is dismissed.

## IV.    CONCLUSION

For all the aforementioned reasons, Deputy Baker's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiffs' claim of intentional infliction of emotional distress is dismissed. This case will proceed on plaintiffs' claims of (1) excessive force

in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983, (2) assault and battery pursuant to Ohio law, and (3) wrongful death pursuant to Ohio law.

      **IT IS SO ORDERED**.

Dated: June 30, 2023

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT COURT**
**CHIEF JUDGE**

21